## William Newman v. The State.

### No. 5287.    Decided June 25, 1919.

**1.—Murder—Manslaughter—Evidence—Wounds—Practice in District Court.**

Where, upon trial of murder and a conviction of manslaughter, it appeared from the evidence, that there had been a prior difficulty between the parties and their companions, in which one of the latter who was with deceased received some wounds on the back inflicted by the defendant, about which there was no issue or dispute, it was reversible error to permit this companion of the deceased to take off his clothes and exhibit to the jury the scars of the wounds on his back.

**2.—Same—Evidence—Conduct of District Attorney.**

Where, upon trial of murder and a conviction of manslaughter, the district attorney propounded all kinds of questions about the collateral matters and conversations, the answers to most of which were inadmissible in evidence, and thereafter in his argument traveled outside of the record, and thus in an indirect way got matters before the jury which were entirely outside of the record, and defendant's punishment was very likely enhanced thereby, the same was reversible error.

Appeal from the District Court of Wood. Tried below before the Hon. J. R. Warren.

Appeal from a conviction of manslaughter; penalty, four years imprisonment in the penitentiary.

The opinion states the case.

No brief on file for appellant.

*E. A. Berry,* Assistant Attorney General, for the State.—On question of permitting witness to exhibit scars of wounds before the jury: Parrish v. State, 32 Texas Crim. Rep., 583; Weaver v. State, 34 id., 282; Jackson v. State, 63 id., 351; Welch v. State, 66 Texas Crim. Rep., 525, 147 S. W. Rep., 572; Carter v. State, 75 Texas Crim. Rep. 110, 170 S. W. Rep., 739; Spannell v. State, 203 S. W. Rep., 357; Krebs v. State, 3 Texas Crim. App., 348.

DAVIDSON, PRESIDING JUDGE.—This conviction was for manslaughter with the punishment assessed at four years in the penitentiary.

The killing occurred at a country dance. Appellant was one of the musicians at the dance. During an interlude he left the house to attend a call of nature. Returning he came upon two boys in a friendly scuffle. He became mixed up in the matter, and the deceased came; some words ensued between them of rather an aggressive nature, and the evidence is in contradiction as to whether they engaged in a fight or not. Some of the testimony shows they did, and that the deceased was the aggressor. They were separated and appellant returned to the house, and continued playing his instrument, and also took part in one dance. He left the room where the dance was, to get a drink of water and returning, met the deceased in the hallway. Some words ensued, and Pruitt invited appellant to go out in the yard. Appellant followed him until they reached a point of something like thirty or thirty-five yards from the house where the dance was in vogue. The deceased followed as did Alexander. A difficulty arose. Pruitt testified that after they reached the designated point he reached down to pick up a stick, which he described as being about three feet long, two or three inches wide and something under an inch in thickness. As he did this appellant stuck his knife in him cutting him nine times. Deceased came into the difficulty at this point and appellant cut him twice. The wound across the muscle of the right arm went to the bone, severing an artery from which deceased bled to death. Alexander also took a hand in it and he was cut by appellant.

Appellant's theory was that there was a conspiracy to kill or seriously whip him. The court charged this theory on self-defense. Murder, manslaughter and self-defense were given in charge by the court to the jury. There is evidence showing that there was animosity between the parties, and a readiness on the part of all of them to engage in trouble. It is evident that the last trouble grew out of the first occurring between deceased Foster and appellant something like an hour before the fatal tragedy. It is unnecessary to repeat the testimony in this connection. The two difficulties are so blended and intermixed that one can not be separated from the other. The second evidently was but a renewal of the first difficulty.

85 Texas Criminal Reports. [June,

While the witness Pruitt was testifying he was required by the State, over the objection of appellant, to pull off his clothes and exhibit to the jury the scars of the wounds on his back. These scars were produced from the wounds inflicted by appellant during the difficulty. These scars were of such a nature as to indicate that the wounds were severe and very uncomely in appearance. They are described and made to appear in the record as being of an ugly nature. We are of opinion this should not have been permitted. There was no question raised by any of the testimony but what appellant did the cutting, and that he inflicted nine knife wounds, and these were on Pruitt's back. If there had been a question to be solved by the exhibition of these wounds, we would have had a different proposition, but there was none. Concededly and without question these wounds were testified to have been in the back, and all the details of the testimony were given as to how they occurred and the manner in which they did occur. The exhibition of the scars on the naked person before the jury could serve no purpose and tended to solve no issue, and from the ugly nature of the scars, as described, evidently must have had adverse effect upon the minds of the jury inasmuch as they gave him two years above the minimum for the offense of manslaughter. The rule with reference to this character of testimony has been the subject of many decisions in Texas which are collated by Mr. Branch in his Annotated P. C. on pages 1031 and 1032, Sec. 1855. It is permissible to introduce this character of testimony only when its introduction serves to illustrate some point or solve some question, or serves to throw light upon the matter connected with the proper solution of the case, and under no other circumstances. But if there is no question as to the location of the wounds, or their effect and character, such exhibition to the jury should not occur. Its exhibition could only serve the purpose of inflaming the minds of the jury. Mr. Branch collates quite a number of cases sustaining both propositions.

A bill of exceptions recites that while Russell Wilson was testifying in behalf of appellant, on cross-examination by the State he was asked by the district attorney if he had not been shooting craps with Calvin Smith. Calvin Smith was a witness for appellant. The court sustained the objection and instructed the jury not to consider the matter for any purpose. It is also recited in another bill that the State was permitted to ask the same witness, or rather make this statement to the witness: "When was it you heard this statement you say you heard Bill Foster make, the one you told Mr. Jones about a while ago, have you forgotten already what you said you heard him say? Answer, heard Bill Foster say? Question, Yes, have you got a patent on that testimony, does it have to come out kinder like it is in a school book for you to tell it?" These and other bills of exception somewhat of the same nature show an unfair and illegitimate way in which the cross-examination of this

witness and other witnesses was carried on by the prosecution. Without deciding here that this was or was not reversible error, we want to call attention again to the fact that witnesses should be examined in a legal way, and that the manner herein indicated was not conducive to a fair trial. Counsel should refrain from that character and manner of examination of witnesses, and from making statements and innuendoes of such character. Questions can be asked and answers elicited without going into that character of discussion and statements. This manner of examination is intended, of course, to minimize the standing of the witness and indirectly to impeach him. We are of opinion this is not a fair way of examining witnesses.

Another bill recites that after the defendant's witness, Calvin Smith, had testified, the district attorney propounded to State's witness Jack Strange the following question and elicited from him the following answer: "Q. What if anything did you tell Calvin Smith about locking him up in the barn after you got to the dance that night? A. 1 told him that if he did not behave himself we would have to lock him up in the barn to make him keep quiet." Various objections were urged to this testimony. The court signs this with the explanation that, "Charlie Smith, Calvin Smith and Jack Strange went to the dance together. Calvin Smith testified in the case, and it became a material inquiry whether Calvin Smith was drunk when he got to the party or dance. Charlie Mitchell had testified that Calvin Smith was not 'pretty drunk,' he did not seem to be. Then the State laid the predicate for the testimony complained of in this bill by asking Charlie Mitchell, 'if he did not hear Jack Strange tell him (Calvin Smith) when he got off the horse that he was too drunk and that if he did not behave himself, he would lock him up in the crib,' and I think the testimony complained of, was impeachment of the witness Charlie Mitchell." The court was in error in his conclusion. It was a collateral matter and a conversation occurring between third parties, and a statement of hearsay declarations that was not legitimate, nor permissible even to impeach Charlie Mitchell. The statement of Jack Strange to Smith about his mental condition on account of intoxicants would not be permissible to attack the testimony of Charlie Mitchell. It was but an indirect way of getting before the jury the statement of Jack Strange that he believed the witness Smith was drinking too much. Just how it could serve to impeach Charlie Mitchell is not apparent.

There are a number of bills of exception reserved to remarks of the district attorney Maynor and private prosecutor Beavers. One of the bills recites that in his opening argument Mr. Maynor stated to the jury: "That Alger Dodson (who was a very important witness for the defendant in this cause) ran off in order to enable the defendant to continue this case at the last term of this court." A

bill of exceptions was reserved to this remark, and also to the court's refusal to give a special charge requested by appellant asking its withdrawal from the jury and instructing them not to consider it. The court explains the bill by stating: "The remarks by the district attorney complained of were made in his discussion of the witness' interest in the case and given as his deduction from the evidence, and I so certified in refusing the requested charge." Another bill was reserved to remarks of the same officer as follows: "That Russell Wilson had suborned Calvin Smith and Alger Dodson and had them to swear falsely in this case." Special instructions were requested asking the court to instruct the jury not to consider it, and refused by the court. The court says he refused this charge because the statements of the district attorney, in his opinion, were but his deductions from the testimony. Mr. Beavers, private prosecutor, in his closing argument used the following language: "This bully, assassin and murderer should be convicted." The court instructed the jury not to consider these remarks. The same private prosecutor used the following language: "That the defendant had courted the wife of the deceased before she married and he wanted to see her a widow." A special charge was asked requesting its withdrawal from the consideration of the jury and refused because the court states he understood the remarks were given as the attorney's deductions from the evidence. These remarks and speeches are mentioned to illustrate in a general way the manner in which the case was tried. The matters herein mentioned and discussed do not manifest that this case had that character of trial guaranteed by our laws. Appellant received two years more punishment than the minimum fixed by the statute for manslaughter. The evidence complained of and the remarks may have contributed to the amount of punishment above the lowest penalty. The defendant is entitled to a fair trial under the law, and in accordance with the terms of the law.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*